**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE No. 21-CR-80040-ROSENBERG**

UNITED STATES OF AMERICA,

      *Plaintiff,*

v.

Breon D. Hicks,

      *Defendant.*

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

This matter is before the Court on Defendant Breon D. Hicks's Motion to Suppress. DE 49. The Court has carefully reviewed Hicks's Motion [DE 49] and the Government's Response [DE 54], the Transcript (hereinafter "Hearing Tr.") of the Motion to Suppress Hearing ("Hearing" or "Suppression Hearing") held on September 17, 2021, and the record. For the reasons set forth below, Hicks's Motion to Suppress is **GRANTED in part and DENIED in part**.

### I. BACKGROUND

The Court makes the following factual findings based on the Bodycam Footage ("Footage") admitted at the Hearing as Government's Exhibit 1, a transcript of the exchange captured on the Footage admitted at the hearing as Government's Exhibit 2, as well as the testimony of Government Witness Sergeant Robert Lahiff, presented at the Hearing.

On October 29, 2019, at approximately 6 p.m., law enforcement pulled over Mr. Hicks for speeding and for having unlawfully tinted windows. DE 54 at 6. By the time the Footage begins, Mr. Hicks has pulled over. The Footage shows that it is still fairly light outside and that Mr. Hicks

had been stopped on a relatively busy street. Three unmarked police vehicles are visible in the shot: two are parked in front of Mr. Hicks's car; one behind. Each has its emergency lights flashing. It is undisputed that there were helicopters circling overhead. Hearing Tr. at 23, 40. Mr. Hicks is sitting in the driver's seat with both hands visibly resting on the dashboard, and the driver's side window is fully ajar. At least three officers are present and in close proximity to Mr. Hicks. At T22:17:38 (00:02 into the bodycam video),[1] one officer ("Officer 1") is seen on the left side of the screen, standing by the driver's side side-view mirror. Officer 1 is holding a gun, pointed at Mr. Hicks, in his right hand, while he is reaching his left hand into the car and holding Mr. Hicks's left hand against the dashboard. By T22:17:50 (00:14), Officer 1 has lowered the gun to a "defensive" position, such that it is not directly pointed at Mr. Hicks, but it is still raised and visible above the car window.  At T22:17:53 (00:17), Sergeant Lahiff opens the driver's door and stands in front of the driver's seat cavity. Officer 1 holsters his firearm at T22:17:57 (00:21) but is still reaching into the driver's seat area. At T22:18:01 (00:25), Officer 1 releases control of Hicks's left hand, but within seconds, Sergeant Lahiff has grabbed control of Mr. Hicks's left forearm. T22:18:07 (00:31). The Footage has no sound until T22:17:59 (00:23), at which point Sergeant Lahiff asks Mr. Hicks, "You been smokin' today? You been smokin' today? I can smell a lot of weed comin'." Mr. Hicks's response is inaudible. In response, Sergeant Lahiff instructs Mr. Hicks to "come on out of the car." Mr. Hicks appears to question why he's being asked to get out of the car, but the exact content of his response is unintelligible. Sergeant Lahiff then replies to Mr. Hicks, "Because I'm asking you to," all while maintaining control of Mr. Hicks's left wrist or forearm. T22:18:08–09 (00:31–32). Sergeant Lahiff then instructs Mr. Hicks to "take off your seatbelt with your right

---

[1] For ease of reference, at all points hereafter, time represented as (00:00) refers to the minutes and seconds of the video file as viewed on an audio-visual program, as opposed to the bodycam video's internal time stamp located at the top righthand corner of the video.

hand," but before Mr. Hicks is given an opportunity to do so, Officer 1 reaches in to remove Mr. Hicks's seatbelt. As Mr. Hicks is then removed from the car, Officer 1 is holding Mr. Hicks's right bicep and Sergeant Lahiff is securing Mr. Hicks's left wrist or forearm. Standing outside of the vehicle, while Sergeant Lahiff and Officer 1 are holding Mr. Hicks, Sergeant Lahiff asks, "So do you have your medical marijuana card on you?" T22:18:28 (00:51–52). Mr. Hicks responds, "Um, its, I haven't got the physical yet, just the um the email." Then Sergeant Lahiff asks, "Alright, you got anything illegal on your person, handguns, grenades?"; Mr. Hicks responds, "No, sir." T22:18:39 (01:03). During these questions, a fourth officer approaches the group surrounding Mr. Hicks. T22:18:37 (01:01), and Sergeant Lahiff and Officer 1 continue holding both of Mr. Hicks's wrists or forearms. At T22:18:43 (01:07), Sergeant Lahiff instructs Mr. Hicks to turn around and place his hands on the car; Mr. Hicks complies. After Mr. Hicks turns to face the car, Officer 1 continues to firmly grip Mr. Hicks's left arm as Sergeant Lahiff conducts a pat-down search. T22:18:47 (01:11). At T22:18:53 (01:16), Sergeant Lahiff asks Mr. Hicks, "No guns, right?" Mr. Hicks replies, "Yes, sir, I have my concealed weapons permit." In response, Sergeant Lahiff asks Mr. Hicks where the weapon is; Mr. Hicks's reply is unintelligible. T22:18:55–58 (01:19–22). Then, Sergeant Lahiff says to Hicks, "I just want to make sure it's not on you." T22:19:01 (01:25). Shortly after this point, a fifth officer is visible standing behind Sergeant Lahiff, who continues to conduct the search of Mr. Hicks. T22:19:03 (01:27). At T22:19:12–14 (01:35–37), Sergeant Lahiff remarks, "Alright, let's secure him since he doesn't want to answer that question," (regarding an item in Mr. Hicks's pocket)[2] at which point, the officers place Mr. Hicks in handcuffs. Sergeant

---

[2] The parties have mutually agreed that the Government will redact the following questions and comments denoted in bold. Hearing Tr. at 5–7; DE 54 at 6. Sergeant Lahiff's question **"What are these tablets in your pocket?"** will be redacted. In response to Hicks's silence, Lahiff instructs Officer 1 to "secure him, **since he doesn't want to answer that question**." The comment "since he doesn't want to answer that question" will be redacted. Finally, near the end of the encounter, Lahiff instructs Officer 1 to "Go ahead and walk him back there **and, he's got some pills in his right front watch pocket that obviously he doesn't want to identify.**" The bolded part of this statement will be redacted for trial.

3

Lahiff continues to ask Mr. Hicks questions. After Mr. Hicks is handcuffed, Lahiff asks, "So you have medical marijuana, but you don't have it with you?" T22:19:20–24 (01:43–47).  At T22:19:39 (02:02), a sixth officer is seen approaching the group of officers standing around Mr. Hicks. At T22:20:27–28 (02:50–51), the officer wearing the body cam leans into the driver's cavity and picks up a firearm on the sitting on the floor of the car. That officer then unloads the firearm. T22:20:33–55 (02:56–03:18). While that officer unloads the gun, Sergeant Lahiff informs Mr. Hicks why he has been pulled over. T22:20:44 (03:07). At T22:21:19 (03:49), Officer 1 takes Mr. Hicks  back to a police car. At this time, there are seven identifiable officers surrounding Mr. Hicks, including the officer wearing the bodycam. And at no point in the Footage does any officer advise Mr. Hicks of his *Miranda* rights.

Mr. Hicks moved to suppress [DE 49] all statements made by him in the Footage, marked as Government's Exhibit 1 and reflected in the Hearing transcript marked as Government's Exhibit 2 [DE 55, 57]. Mr. Hicks contends that from the moment the Footage begins, he is in police custody for the purposes of *Miranda* and that at no point in the interaction did the Public Safety exception apply. Hearing Tr. at 43. The Government contends that Mr. Hicks was not subject to a custodial interrogation at any point in the Footage, and that even if he was, from the point at which Sergeant Lahiff asked about the presence of any weapons or firearms, the public safety exception to *Miranda* applied. Hearing Tr. at 63–67.

## II. LEGAL STANDARD

### A.  Custodial Interrogation

The Fifth Amendment of the United States Constitution provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Court recognized that this right extends beyond court proceedings and

"serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." 384 U.S. 436, 467 (1966). In other words, the Fifth Amendment's protections extend to what we now term "custodial interrogations." The Court recognized that "without proper safeguards . . . in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* So once that "in-custody interrogation" has begun, the Fifth Amendment requires that law enforcement inform the suspect in "clear and unequivocal terms that he has the right to remain silent." *Id.* at 467–68. If, at the time a custodial interrogation begins, the suspect has not been advised of his *Miranda* rights, any statements he makes to law enforcement during that interrogation may be excluded from evidence. *Id.* at 469.

To determine whether a particular interaction amounted to a "custodial interrogation," the court must determine whether, under the circumstances, a "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d. Cir. 2004)) (emphasis omitted).  To make such a determination, the court considers the totality of the circumstances, including: the location and duration of the detention, "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated the compliance with the officers could be compelled." *Luna-Encinas*, 603 F.3d at 881 (quoting *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006); citing *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006); *United States v. Medina-Villa*, 567 F.3d 507, 519 (9th Cir. 2009)). Importantly, even if a reasonable person would feel constrained not to leave a police encounter *at a particular moment* does not render the interaction a "custodial interrogation"

for the purposes of the Fifth Amendment. *United States v. Street*, 472 F.3d 1298, 1310 (11th Cir. 2006). The question is rather whether the detention *as a whole* involved a "highly intrusive coercive atmosphere" typically associated with an arrest. *Luna-Encinas*, 603 F.3d at 881, 882 (quoting *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)).

But these encounters occur in a myriad of contexts, and traffic stops are a bit of a different beast. Indeed, it is well-settled that "a person temporarily detained pursuant to an *ordinary* traffic stop is not 'in custody' for the purposes of *Miranda*." *United States v. Crawford*, 294 Fed. App'x 466, 473 (11th Cir. 2009) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)) (emphasis added). Courts do not apply the *Miranda* two-part inquiry "literally" to traffic stops because any "reasonable person knows that he is not free to drive away from a traffic stop until it is completed. If the lack of freedom to leave were decisive, . . . then all traffic stops . . . would be subject to the requirements of [*Miranda*]." *United States v. Acosta*, 363 F.3d 1141, 1149 (11th Cir. 2004). The Supreme Court in *Berkemer v. McCarty* declined to adopt such a rule, and instead specified that the court should determine "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." 468 U.S. 420, 437 (1984).

This is not to say that a traffic stop cannot mature into a custodial interrogation; it certainly can. To determine whether such a metamorphosis has occurred, courts look to two factors, in addition to those enumerated above (e.g., brandishing of weapons, officers' verbal "tone," use of physical force or restraints). First, the court examines the length of the interaction because, in contrast with stationhouse interrogations, which are the quintessential custodial interrogation, traffic stops are "presumptively temporary and brief." *Id.* at 437. Stationhouse interrogations are, on the other hand, "frequently . . . prolonged" and often involve a dynamic where the detainee "is

aware that questioning will continue until he provides his interrogators the answers they seek." *Id.* at 438. Second, the court asks whether, under the circumstances, the person stopped would "feel[] completely at the mercy of the police" or whether the stop is more "police dominated" than your run-of-the-mill traffic stop. *Id. Berkemer* highlighted certain aspects of a traffic stop as critical to this inquiry, namely: the presence of witnesses, the publicness of the traffic stop, which deters law enforcement from employing any "illegitimate means" of eliciting self-incriminating statements, and the fact that "the detained motorist typically is confronted by only one or at most two policemen." *Berkemer*, 468 U.S. at 438–39. On the whole, the Court reasoned, the atmosphere of an ordinary traffic stop is "substantially less police dominated" than the kinds of interrogation at issue in *Miranda*. *Id.* at 439 (internal quotations omitted). Deciding which dynamic is at play in a given case is a fact-intensive inquiry.

A number of Eleventh Circuit cases are instructive. First, we have *United States v. Luna-Encinas*, 603 F.3d 876 (11th Cir. 2010). There, Luna-Encinas and another man were working in his backyard when law enforcement approached them, guns drawn but pointed down, in search of another person. *Id.* at 878. The law enforcement officers immediately informed Luna-Encinas and the other man that they were looking for a specific person and that they knew that neither Luna-Encinas nor the other man was that person. *Id.* at 878–79. The officers then asked Luna-Encinas and the other person whether someone had run through the yard or into the residence and if there were any men in the residence. *Id.* at 879. After Luna-Encinas and the other man answered in the negative, law enforcement then directed him and the other man to sit down in the yard until the residence had been secured. *Id.* Luna-Encinas and the other man complied, for some ten minutes, until the subject of the pursuit had been captured and the house secured. *Id.*

During the search, law enforcement found a firearm box and bullets in the room shared by the suspect (the subject of the original pursuit) and Luna-Encinas. *Id.* Another resident of the home spontaneously identified Luna-Encinas as the cohabitant of the room where the firearm box and ammo were found. *Id.* An officer then asked Luna-Encinas where the handgun was located; Luna-Encinas told the officer that the gun was under his mattress. *Id.* He also admitted to the officer that the firearm was his and that he was an illegal alien. *Id.* He was then arrested for violating a federal gun possession law. *Id.* at 880. Before the point of his formal arrest, law enforcement did not inform Luna-Encinas of his *Miranda* rights. *Id.* Luna-Encinas filed a motion to suppress the statements made to the officers pre-*Miranda*. *Id.* The district court denied his motion, noting that "a reasonable person in Luna-Encinas' position—i.e., one placed under the control of several law enforcement officers for a matter of fifteen minutes while a drug suspect was sought—would not have understood his detention to be anything other than 'temporary and brief,'" especially considering the officers explained that he wasn't the person they were looking for. *Id.* at 880.  An Eleventh Circuit panel affirmed.

Luna-Encinas argued that any admission made to the police during the interaction was improperly procured because the interaction amounted to a custodial interrogation and because he had not been advised of his *Miranda* rights. *Id.* In deciding that the interaction did not meet the threshold for a custodial interrogation, the Eleventh Circuit relied on the following facts.

On one hand, law enforcement asked the defendant in a "serious" tone to sit down and stay put. *Id.* at 881. But on the other, he was at home, on "familiar ground"—as opposed to at a police station. *Id.* at 882. At no point before his formal arrest was he physically touched or restrained by the officers. *Id.* at 881. No handcuffs were used before his arrest. *Id.* at 882. He was "neither threatened nor intimidated verbally or physically." *Id.* at 881. Lastly, "a weapon was never pointed

8

or directed at him" *Id.* Under a totality of the circumstances analysis, the fact that the officers spoke to Luna-Encinas in a "serious tone" was not enough on its own to render the interaction a custodial interrogation. *Id.* at 881–82.

In *United States v. Crawford*, the Eleventh Circuit likewise found no custodial interrogation during a traffic stop. 294 Fed. App'x 466 (11th Cir. 2008). There, Crawford was driving on the highway at around 2 a.m. when he was pulled over for having a light out on the car and for driving erratically. *Id.* at 468. Crawford appeared nervous to the officer (e.g., sweating, hands shaking), which caused the officer to suspect criminal activity. *Id.* The officer asked Crawford whether he had any weapons in the car; Crawford said that he did not have anything on his person and that if there were any weapons in the car, they did not belong to him because the car was not his. *Id.* The officer then determined that Crawford's license was suspended, so he placed Crawford under arrest for driving with a suspended license. *Id.* Once Crawford was handcuffed and secured in the police cruiser, the officer conducted an inventory search of the car that Crawford had been driving. *Id.* During the search, the officer found three firearms in the trunk, and after running a criminal check on Crawford, determined that he was a convicted felon. *Id.* Crawford was then charged with felony possession of the firearms. Crawford moved to suppress his pre-arrest statements on the grounds that he was not advised of his *Miranda* rights. *Id.* The district court denied the motion, and the Eleventh Circuit affirmed, holding that the circumstances did not support a finding that Crawford was the subject of a custodial interrogation prior to his formal arrest. *Id.* at 469, 474.

The Eleventh Circuit noted that there was "no evidence that [the officer] was accompanied by other officers, drew his gun or ordered Crawford into a position, such as on the ground or against a car, more commonly associated with a formal arrest." *Id.* at 474. Furthermore, during the

questioning, "Crawford was standing at the back of his car in a parking lot open to public view, he was not physically restrained, he was questioned only briefly and he was not told he was going to be arrested." *Id.* The restraint that was used was minimal—the amount necessary to conduct the stop—and did not involve a "highly intrusive" and coercive atmosphere contemplated in *Miranda*. *Id.*

In *United States v. Ubaldo-Viezca*, the defendant was the passenger in a car pulled over for speeding. 398 Fed. App'x 573, 575 (11th Cir. 2010). The driver informed the officer that she and the passenger were co-owners of the vehicle and that she had been previously arrested for smuggling people into the country and that she still sometimes did. *Id.* Upon running the driver's license and plates, the officer confirmed that the driver had multiple prior arrests for human smuggling. *Id.* at 576. The officer also ran the license of the passenger, Ubaldo-Viezca, and learned that he was a suspect in "an ongoing narcotics investigation." *Id.* The driver consented to a search of the car. *Id.* During the search, the officer conducted an "echo test" on the car's axles to determine whether anything was hidden inside. *Id.* The officer determined based on the sound that there was something inside the axle. *Id.* The officer then asked Ubaldo-Viezca to drive the car to the trooper auto shop, where the officer would be able to search the axles. *Id.* Ubaldo-Viezca consented. *Id.* When they arrived at the auto shop, Ubaldo-Viezca told the officer that he was "currently working on a deal for the DEA," to which the officer replied, "Let me guess. There's dope in the axles." *Id.* Ubaldo-Viezca confirmed that there was and admitted that the axles contained 8 kilograms of cocaine. *Id.* After law enforcement extracted the cocaine, Ubaldo-Viezca was Mirandized and arrested. *Id.*

Ubaldo-Viezca moved to suppress those admissions on the basis that the traffic stop interaction amounted to a custodial interrogation and the officer had failed to inform Ubaldo-

Viezca of his *Miranda* rights. *Id.* The district court denied the motion to suppress, and the Eleventh Circuit panel affirmed.

The Eleventh Circuit held that the statements made at the site of the traffic stop were admissible because Ubaldo-Viezca made them spontaneously. *Id.* at 580. With respect to the statements made at the trooper auto shop, the panel held that although the statement "Let me guess. There's dope in the axles" and follow-on questions were the "functional equivalent of an interrogation" because they were "reasonably likely to elicit an incriminating response," Ubaldo-Viezca was not "in custody" at the time that they were made. *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980)) (internal quotation marks omitted). Under the totality of the circumstances, Ubaldo-Viezca was not in custody because: (1) "his freedom was not restricted to a degree associated with a formal arrest"; (2) even though the traffic stop was long—over an hour—it only extended beyond the initial encounter because the driver and Ubaldo-Viezca both consented to a search of the car; (3) no evidence suggests that Ubaldo-Viezca "objected to the length of the stop or indicated that he wished to leave"; (4) Ubaldo-Viezca initiated the conversation at the trooper auto shop; (5) the officer's "let me guess" comment suggests that the "tone and nature of the interaction was casual, rather than serious"; and lastly, (6) that at no time did the officer brandish his weapon, touch the defendant, or otherwise restrict his freedom of movement prior to his formal arrest. *Id.* (citing *Berkemer*, 468 U.S. at 440; *Luna-Encinas*, 603 F.3d at 881).

In *United States v. Acosta*, police were surveilling Acosta for his suspected involvement in a money laundering operation. 363 F.3d 1141, 1142 (11th Cir. 2004). An undercover officer had been in contact with the suspect, Acosta, and the officer confirmed that Acosta would be delivering nearly $300,000 in cash as part of a swap. *Id.* at 1143. The police witnessed Acosta and another

man, Sade, leave Sade's apartment and get into Acosta's vehicle with a duffle bag suspected to contain the illicit cash. *Id.* The police stopped Acosta in the parking lot of Sade's apartment complex, right before the "drop" was about to be made. *Id.* Five or six officers approached the car, and at least one officer had a gun drawn on the vehicle. All guns were "re-holstered within ten seconds" of the initial approach. *Id.* "An officer immediately told Acosta that he was not under arrest but that they wanted to talk to him about a money laundering investigation." *Id.* Law enforcement asked Acosta whether there was any money, weapons, or drugs in the car; Acosta answered that there wasn't. *Id.* After Acosta consented to a search of his car, but before the search was conducted, Acosta admitted that there was money in the car. *Id.* The police found a duffle bag holding tablets of heroin and $278,000 in cash. *Id.* The officers then placed Acosta under arrest and informed him of his *Miranda* rights. *Id.* After being Mirandized, he admitted that the heroin belonged to him and that the passenger, Sade, was not involved. *Id.*

Acosta moved to suppress all of the statements made to the officers outside of Sade's apartment building, which the district court denied. *Id.* at 1144. Acosta argued that he was "in custody" from the moment the stop began, and therefore entitled to *Miranda* warnings. *Id.* at 1148. The Eleventh Circuit disagreed. Acosta was "stopped in the parking lot of an apartment building in broad daylight," and "questioned after any weapons were quickly put back into their holsters." *Id.* at 1150. The officers exerted no physical force against him, nor was he handcuffed. *Id.* He was also assured that he was not under arrest at the time of the stop. *Id.* Taken together, the "stop did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *Id.*

Lastly, the Government relies in part on *United States v. Caraballo*, an unpublished Third Circuit opinion. 643 Fed. App'x 163 (3d Cir. 2016). Caraballo was pulled over for having tinted

front car windows in violation of state law. *Id.* at 166. When Caraballo rolled down his window, the officer smelled freshly burned marijuana. *Id.* When the officer asked Caraballo for his documents, he also asked whether Caraballo had been smoking marijuana in the vehicle. *Id.* Caraballo replied that he had an hour prior but denied that there was any in the car when asked. *Id.* The officer asked Caraballo to step out of the vehicle and Caraballo complied. *Id.* The officer then searched the car with Caraballo's consent. *Id.*

Caraballo moved to suppress his pre-arrest statements under Miranda. *Id.* at 168. The district court denied the motion; the Third Circuit panel affirmed. *Id.* at 169. The Third Circuit divided the encounter into two stages: (1) when Caraballo is questioned while still in the driver's seat, and (2) after Caraballo exited the vehicle. *Id.* at 168. At neither point did the interaction amount to a custodial interrogation. *Id.* With respect to the first part, the officer took no actions that would cause the interaction to mature from a typical, non-coercive traffic stop into "a curtailment of Caraballo's freedom of movement 'to the degree associated with a formal arrest.'" *Id.* (quoting *United States v. Williaman*, 437 F.3d 354, 359 (3d Cir. 2006)). As for the second part, "the traffic stop was relatively brief and occurred in public." *Id.* at 169. Nor did the facts support a finding that the officers used coercive tactics "such as hostile tone or a display of weapons." *Id.* Consequently, the officer did not "exert pressures that sufficiently impaired Caraballo's free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.* at 168–69 (quoting *Berkemer*, 468 U.S. at 437) (cleaned up).

Finally, "[t]he evidentiary burden at a suppression hearing is a preponderance of the evidence." *United States v. Sigouin*, 494 F. Supp. 3d 1252, 1261 (S.D. Fla. 2019) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)). The movant bears the burden of proof and

persuasion to show that he was in custody at the time the statements at issue were made. *Id.* (citing *United States v. Touset*, 890 F.3d 1227, 1231 (11th Cir. 2018)).

### B.  The Public Safety Exception

"The public safety exception allows officers to question a suspect without first Mirandizing him when necessary to protect either themselves or the general public." *United States v. Newsome*, 475 F.3d 1221, 1224 (11th Cir. 2007) (citing *New York v. Quarles*, 467 U.S. 649, 655–58 (1984)). The test is whether, under the circumstances, there is "an objective reasonable need to protect the police or the public from any immediate danger." *Quarles*, 467 U.S. at 659 n.8. The Court stated that this exception to *Miranda* was intended to be "narrow," and will be "circumscribed by the exigency which justifies it." *Id.* at 658. The exception permits an officer "to question a suspect about the location of a weapon the *officer reasonably suspects is present* without first having to administer *Miranda* warnings." *United States v. Stokeling*, 2016 WL 8983362, at *2 (S.D. Fla. Feb. 12, 2016) (emphasis added). With respect to the public safety exception, the Government bears the burden to prove by a preponderance of the evidence that circumstances supporting the public Safety exception existed. Fed. R. Evid. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 176 (1987) (holding that Federal Rule of Evidence 104(a) requires that preliminary questions of admissibility must be established by a preponderance of the evidence); *Cf Washington v. Tobeck*, 432 Fed. App'x 900, 901 (11th Cir. 2011) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984)) (holding that the Government bears the burden for establishing that exigent circumstances existed to justify a warrantless search).

### III. DISCUSSION

#### A. Custodial Interrogation

Because the encounter at issue is a traffic stop, and bearing in mind that "ordinary traffic stops do not involve custody for purposes of *Miranda*," the Court must not apply the traditional custodial interrogation test literally. *Pennsylvania v. Bruder*, 488 U.S. 9, 11 (1988). Rather, the Court must examine the totality of the circumstances in determining whether Mr. Hicks was subject to a custodial interrogation. To that end, the Court looks to where the encounter took place, the time of day, the length and tenor of the encounter, the number of officers on the scene, whether any officer brandished his weapon, whether Mr. Hicks was physically touched by the officers, whether he was handcuffed, and whether the officers otherwise restricted his movement. *See, e.g.*, *United States v. Crawford*, 294 Fed. App'x 466, 474 (11th Cir. 2008); *United States v. Luna-Encinas*, 603 F.3d 876, 881–82 (11th Cir. 2010); *United States v. Ubaldo-Viezca*, 398 Fed. App'x 573, 575 (11th Cir. 2010). In considering the aforementioned factors, the Court must ultimately determine whether Mr. Hicks's freedom was restricted "to a degree associated with a formal arrest." For the following reasons, the Court finds that Mr. Hicks has established, by a preponderance of the evidence, that he was subjected to a custodial interrogation once he was removed from the car.

First, the encounter took place on a fairly busy road in the early evening when it was reasonably light outside. Police helicopters circled overhead. The Footage of the encounter is a little over four minutes long, but the audio is available for only approximately three-and-a-half minutes. The total length of the encounter necessarily exceeds four minutes, however, because at the time the Footage begins, Mr. Hicks had already pulled over and had been approached by three

officers, and because the exact timing between the end of the Footage and Mr. Hicks being Mirandized is unclear.

The number of officers on the scene varies from start to finish. At the beginning, at least three officers are visible on camera: Sergeant Lahiff, Officer 1, and the officer wearing the bodycam. About one minute in, a fourth officer appears close by; about thirty seconds later, a fifth. Thirty seconds after that, a sixth officer approaches. By three minutes and forty-nine seconds in, at least seven different officers are visibly standing around or near Mr. Hicks. Questioning persisted for effectively the entire encounter.

With respect to the tenor, Sergeant Lahiff's questioning was, for the most part, polite. However, when Sergeant Lahiff instructed Mr. Hicks to get out of the car, and Mr. Hicks appeared to question why, Sergeant Lahiff responded, "Because I'm asking you to" in a tone that indicated that Mr. Hicks's "compliance with the officers could be compelled.". *See Luna-Encinas*, 603 F.3d at 881. Of course, a "serious tone" isn't enough on its own to render the interaction custodial. *Id.* at 881–82. However, it is the officers' conduct in conjunction with the serious tone that puts this case over the edge.

When the Footage begins, Officer 1 is "brandishing" or pointing a firearm at Mr. Hicks. Sergeant Lahiff's testimony confirms that Officer 1 approached the car with the firearm raised. Hearing Tr. at 37. Officer 1 lowers the firearm into a defensive position approximately fourteen seconds later, but the gun is not holstered for another seven seconds. It is unclear for how long the officer brandished the firearm before the bodycam began recording.

With respect to physical touch and restraint, from the moment the video begins and for nearly the entire interaction, at least one officer is holding or restraining Mr. Hicks. As Mr. Hicks sits in the driver's seat, Officer 1, holding a gun in his right hand, uses his left hand to hold Mr.

Hicks's left forearm against the dashboard. Officer 1 briefly releases his hold of Hicks's left arm as Sergeant Lahiff opens the driver's door, steps in to block the driver's side cavity, and gains control of Mr. Hicks's left wrist or forearm. At this point, Sergeant Lahiff then asks Mr. Hicks if he has "been smokin' today." After Mr. Hicks provides a less-than-satisfactory response, Sergeant Lahiff instructs him to get out of the car and to use his right hand to remove his seatbelt. It is at this moment that the custodial interrogation begins.[3] This is in part because Officer 1 moves in to remove the seatbelt before Mr. Hicks is given the opportunity to comply. Officer 1 and Sergeant Lahiff then stand in front of the driver's cavity and each grab one of Mr. Hicks's arms to pull him out of the car. Mr. Hicks then stands with his back to the driver's side of the car, with Officer 1 holding Hicks's right bicep and then his forearm, Sergeant Lahiff holding his left wrist, and the officer wearing the bodycam standing immediately in front of him. Mr. Hicks is surrounded. As Mr. Hicks steps out of the car, Sergeant Lahiff, maintaining a grip on Hicks's left wrist, asks Mr. Hicks whether he has his medical marijuana card on him. A third officer then approaches, standing a few feet away from Mr. Hicks. As Mr. Hicks answers the question, Sergeant Lahiff and Officer 1 still maintain control of Mr. Hicks's arms. Shortly thereafter, Sergeant Lahiff instructs Mr. Hicks to turn around and place his hands on top of the car. Hicks complies. Officer 1 firmly holds Mr. Hicks's left arm, around the elbow, as Sergeant Lahiff conducts a frisk. Then, Sergeant Lahiff

---

[3] Before this point, Officer 1 raises and points his firearm at Mr. Hicks, while holding Mr. Hicks's left arm against the dashboard. The audio does not begin until after Officer 1 has re-holstered his firearm, so the Court cannot be certain that Sergeant Lahiff asked Mr. Hicks any questions while the gun was raised. Because the Eleventh Circuit has previously held that a pointed gun alone is insufficient to render a traffic stop custodial, the Court finds that the stop did not constitute a custodial interrogation until Mr. Hicks was removed from the car because too few factors were present to satisfy the requisite totality of the circumstances threshold. *United States v. Blackman*, 66 F.3d 1572, 1576–77 (11th Cir. 1995) ("This Court has said the fact that police . . . draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest."). That Officer 1 brandished a weapon nevertheless factors into the Court's analysis as demonstrating the serious tone of the encounter and increasing the likelihood that Mr. Hicks may reasonably have felt that he was "completely at the mercy of the police" when pulled from the car and questioned. It is the show of force by the officers as they pull him from the car, in context with brandishing the firearm, the tone of Sergeant Lahiff's comment, "Because I'm asking you to," the number of officers present, the helicopters overhead, and the officers' constant touching or restraining of Mr. Hicks, that puts this encounter over the constitutional edge.

handcuffs Mr. Hicks. Immediately after the handcuffs "click," Sergeant Lahiff asks, "So you have medical marijuana, but you don't have it with you?" At least three officers stand surrounding Mr. Hicks when the question is posed.

What's critical about this part of the interaction is that (1) at least one officer is physically holding or restraining Mr. Hicks at all times until he is handcuffed, (2) at least three officers surround him in relatively close proximity the whole time, and (3) Sergeant Lahiff asks him about marijuana use and a medical marijuana card two separate times.

But the questions continue even after Hicks has been handcuffed: Sergeant Lahiff asks, "So you've got medical marijuana?" Hicks replies, "Yes, sir." Lahiff probes, "But you don't have it with you?" to which Hicks replies, "No, I just, I just got it." Lahiff continues, "Okay, you understand that the law requires when you're using to have the card with you, right?" Officer 1 is seen standing immediately behind Hicks, holding his arms which are otherwise handcuffed. The questions that follow from there relate to Hicks's license, concealed weapons permit, and address.

Taken together, the tenor of the interaction is serious from the outset. Officer 1, standing at point-blank range, sets the tone by pointing a gun at Mr. Hicks, who is sitting in his car with his hands on the dashboard. Even after the gun is holstered, the officers physically control Mr. Hicks's locomotion for the entire recorded encounter—grabbing his arms, wrists, and hands and ultimately handcuffing him. Mr. Hicks is visibly outnumbered: at all times, there are at least three officers standing in very close proximity to Mr. Hicks—either with their hands on him or within a few feet (as is the case with the officer wearing the bodycam). All the while, Mr. Hicks is being questioned about marijuana—even after he's been handcuffed. By the end, when Mr. Hicks is escorted off camera by Officer 1, at least six officers are standing around the location where he was just subject to questioning. That Sergeant Lahiff's demeanor was relatively calm, and that the encounter

occurred on a relatively well-lit, busy street cannot alone render the interaction non-custodial. The circumstances as a whole make clear to the Court that Mr. Hicks would reasonably have felt "completely at the mercy of the police" during this encounter. *Berkemer*, 468 U.S. at 438.

*Acosta*, *Crawford*, *Luna-Encinas*, and *Ubaldo-Viezca* make clear that the bar for custodial interrogations is high—particularly for traffic stops. *Acosta* and *Luna-Encinas*, though non-traffic stop cases, are nevertheless instructive. In *Acosta*, the defendant was stopped in the parking lot of an apartment building in broad daylight and questioned after any weapons were quickly re-holstered. 363 F.3d at 1143. The officers exerted no physical force against him, nor was he handcuffed. *Id.* Acosta was also assured that he was not under arrest at the time of the stop. *Id.* In *Luna-Encina*, the defendant was at his own home, the officers never threatened him, touched him, handcuffed him, nor pointed a weapon at him. 603 F.3d at 881–82. In neither case was the defendant subject to a custodial interrogation.

Now to turn to the traffic stop cases. In *Crawford*, there was only one officer on the scene, at no point did the officer brandish a gun, the defendant was not physically restrained, was questioned only briefly, and was not told he was going to be arrested. 294 Fed. App'x at 474. In *Ubaldo-Viezca*, the officer never brandished his weapon, touched the defendant, or otherwise restricted his freedom of movement prior to his formal arrest. 398 Fed. App'x at 576. Although the interaction was protracted, it was only because the defendant had consented to a search of the vehicle. *Id.* A clear pattern emerges: each of these cases depicts an ordinary traffic stop.

But what these cases illustrate is not that the custodial interrogation hurdle is insurmountable; rather, that this case is *different*. This is no *ordinary* traffic stop. The Court is hard-pressed to imagine an ordinary traffic stop necessitating the presence of seven officers, the brandishing of a firearm, the use of physical restraint for the entire interaction, the presence of

19

helicopters overhead, and questioning the suspect even after he has been hand-cuffed (without first Mirandizing him). *Crawford*, *Ubaldo-Viezca* and the like were exactly the kinds of cases the Court had in mind when it penned *Berkemer*. It envisioned your quintessential traffic stop: one officer, perhaps two,[4] pulls over a driver for, say, failing to signal at a turn. "License and registration, please." The officer returns to his vehicle; the motorist waits in hers. A few minutes and a ticket later, the motorist is on her way. It makes perfect sense that under those circumstances, a police officer wouldn't be required to Mirandize someone because the conditions of an ordinary traffic stop do not "exert[] upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer*, 468 U.S. at 437. In other words, when the motorist isn't outnumbered, when she's not restrained, when there are no guns drawn, there is little to no risk that the pressures of the interaction would render any of her statements effectively involuntary. But those risk factors, which are absent in your ordinary traffic stop, are present and numerous here.

Mr. Hicks's case may not present the most egregious set of facts, but that's not what the law requires. *See United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993) (During a traffic stop, the suspect and his pregnant fiancée, the passenger, were stopped in "an isolated, rural area," "forced or ordered to the ground," and questioned while lying face-down as officers "kept their guns drawn on him and his fiancée" and police helicopters circled overhead. The Tenth Circuit held that the totality of the circumstances rendered the interaction a custodial interrogation for *Miranda* purposes.). Nothing in the case law suggests that *Perdue* is the minimum standard for a reasonable person in the defendant's shoes to feel "completely at the mercy of the police." *Berkemer*, 468 U.S. at 438. Rather, the Eleventh Circuit has instructed that the court consider a

---

[4] "[T]he detained motorist typically is confronted by only one or at most two policemen." *Berkemer*, 468 U.S. at 438–39.

totality of the circumstances, including the length of the interaction, whether the police use coercive tactics like physical force, restraints like handcuffs, or a serious tone; whether the interaction occurs in a public or secluded place; and whether the officers brandish weapons. The critical difference is the show of authority—the power asymmetry between the police and the subjects of the stop. Where more of these displays of authority—brandishing a weapon, use of physical force, etc.—exist simultaneously in the traffic stop context, the more likely the stop is to mature into a custodial interrogation.

So although the interaction, at least as it's depicted on the bodycam footage, is relatively short and occurs on a well-lit busy street, and although Sergeant Lahiff's verbal tone remained relatively calm, the presence of the other factors (brandishing of the firearm, continuous physical restraint, presence of between three and seven officers, use of handcuffs, and circling of helicopters above) renders this interaction "custodial" from the point at which Mr. Hicks is pulled from the car.

With respect to the "interrogation" element, the questions about the smell of marijuana and Mr. Hicks's medical marijuana card are clearly "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Freeman*, 591 Fed. App'x 855, 862 (11th Cir. 2014) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). On the other hand, the questions about his driver's license and current address, and whether the rental car has been rented to him are plainly the kind "normally attendant to arrest and custody" unlikely likely to elicit an incriminating response. *Id.* As such, only the following two exchanges[5] are suppressed:

1. From T22:18:26 to T22:18:33 (00:49 to 00:56)

---

[5] The two exchanges occur about a minute apart and are separated by questions unrelated to the use or possession of marijuana or a medical marijuana card.

Lahiff: So you do you have your medical marijuana card on you?

Hicks: Um, its, I haven't gotten the physical yet, just the um the email.

. . .

2.   From T22:19:19 to T22:19:35 (01:43 to 01:59)

Lahiff: So you've got medical marijuana?

Hicks: Yes sir.

Lahiff: But you don't have it with you?

Hicks: No, I just, I just got it.

Lahiff: Okay you understand the law requires when you're using to have the card with you, right?

Hicks: They told me that once I, once I received the um email, that I would be able to have it.

Because these questions were "reasonably likely to elicit an incriminating response from the suspect" and because the Court finds that Mr. Hicks was in custody at the time they were asked, the questions and their accompanying responses are hereby suppressed from admission at trial. *Freeman*, 591 Fed. App'x at 862 (quoting *Innis*, 446 U.S. at 301). On the other hand, Sergeant Lahiff's question and comment, "You been smokin' today? You been smokin' today? I can smell a lot of weed comin'" is not suppressed because the custodial interrogation had not yet begun. It is only when Mr. Hicks is instructed to get out of the car in a "serious" tone and thereafter removed from it, physically held by Officer 1 and Sergeant Hicks, in addition to the brandishing of the weapon and helicopters circling overhead, that the interaction meets the threshold for a custodial interrogation.

**B. Public Safety Exception**

The Government contends that the public safety exception applies from the outset of the traffic stop and covers all of Sergeant Lahiff's questions and Mr. Hicks's responses. Hearing Tr. at 64–65. The Court declines to extend the exception to the entire interaction, particularly because the Government concedes that the odor of marijuana alone is not enough alone to trigger the public safety exception. *Id.* at 63. The Court therefore only considers Sergeant Lahiff's questions about the presence of a firearm as they relate to the public safety exception. The two exchanges are:

1. T22:18:33 to T22:18:38 (00:57 to 01:02)

Lahiff: Alright, you got anything illegal on your person handguns, grenades?

Hicks: No sir.

Lahiff: Anything like that?

Hicks: No sir.

. . .

2. T22:18:52 to T22:19:01 (01:15 to 01:25)

Lahiff: No guns, right?

Hicks: Yes sir, I have my concealed weapons permit.

Lahiff: Okay, where's the gun at?

Hicks: [unintelligible] the car.

Lahiff: I just want to make sure it's not on ya.

The key question is whether it was reasonable under the circumstances for Sergeant Lahiff to believe that Mr. Hicks was armed. *United States v. Stokeling*, 2016 WL 8983362, at *2 (S.D. Fla. Feb. 12, 2016); *United States v. Raveiro*, 2013 WL 12441457, at *6 (S.D. Fla. April 4, 2013). The Court finds that it was reasonable for Sergeant Lahiff to so believe. Accordingly, the questions

and answers about the presence of a firearm are not suppressed under the public safety exception to *Miranda*.

At the Suppression Hearing, Sergeant Lahiff testified that he asked Mr. Hicks the above questions about the presence of a firearm "for officer safety purposes." Hearing Tr. at 20 (responding "Yes" when asked if he "ask[ed] the questions about the firearm to find out whether the Defendant had a firearm for officer safety purposes"). The Court finds Sergeant Lahiff's testimony on this issue to be credible.

At the time of both exchanges, Mr. Hicks was not yet handcuffed. For the first exchange, Sergeant Lahiff asked whether Mr. Hicks had anything illegal, like firearms, *on his person*. Two officers, including Sergeant Lahiff, are standing very close to Mr. Hicks, holding his forearms or wrists at the time the question is posed. Before conducting a pat-down search, it is reasonable for an officer to ask whether the person detained has anything dangerous, like a gun or a grenade, on his person. And because we do not expect officers to craft "the perfect question" "in the heat of the moment," *Newsome*, 475 F.3d at 1225, the question was reasonably constructed with officer safety in mind, *see Stokeling*, 2016 WL 8983362, at *2.

With respect to the second set of questions and answers, Sergeant Lahiff is in the middle of conducting a pat-down of Mr. Hicks when he asks, "No guns, right?" When Mr. Hicks confirms that there is a gun, Sergeant Lahiff asks for its location. The first part of Mr. Hick's response is unintelligible, but the end of the statement, "the car," can be heard on the Footage audio. Sergeant Lahiff then states, "I just want to make sure it's not on ya," as he continues the pat-down search. A little over a minute later, the gun is then located and secured by the officer wearing the bodycam.

Sergeant Lahiff's response, "I just want to make sure it's not on ya" confirms that Sergeant Lahiff was asking the question in the name of officer safety, to ensure that it was not within Mr.

24

Hicks's reach such that he could harm the officers. It is reasonable under the circumstances for Sergeant Lahiff to prophylactically ask about the presence of weapons during a pat-down search, particularly when the detainee is not yet handcuffed. *Cf United States v. Maxwell*, 141 Fed. App'x 878, 881 (11th Cir. 2005) (holding that an officer's question asking the detainee in a traffic stop whether he had any guns in the car to ensure his safety was reasonable under the Fourth Amendment). Here, as was the case in *Newsome*, "[t]he officer's questions clearly were focused on securing the area and protecting the officers." 475 F.3d at 1225.

And although these factual circumstances do not rise to the level of exigency present in *Spoerke* and *Senecharles*, it was nevertheless reasonable for Sergeant Lahiff to fear that a suspect in custody may have access to a firearm on his person before he has been handcuffed. *See, e.g.*, *United States v. Spoerke*, 568 F.3d 1236, 1249 (11th Cir. 2009) (public safety exception applied to defendant's statements made during a traffic stop where the officer identified what looked like a pipe bomb on the floor of the car and inquired about it); *United States v. Senecharles*, 2015 WL 12910750, at *5 (S.D. Fla. May 11, 2015) (holding that the public safety exception applied where, during a traffic stop, officers identified what appeared to be a gun in the defendant's waistband. The public safety exception applied because the officers reasonably believed that the defendant was armed and because the question was tailored to ensure officer and public safety). Accordingly, the two exchanges enumerated above on page 23 are not suppressed, by way of the public safety exception.

25

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant

Breon D. Hicks's Motion to Suppress [DE 49] is **GRANTED in part and DENIED in part**.

**DONE AND ORDERED** in Chambers in West Palm Beach, Florida this 21st day of

September, 2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to: Defendant; Counsel of Record